J-S26002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF A.E.C, MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.D., MOTHER | No. 1964 MDA 2014 |

Appeal from the Decree October 16, 2014
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s): 18-2014

BEFORE:  OTT, J., WECHT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                          **FILED JUNE 30, 2015**

L.D. ("Mother") appeals from the decree entered October 16, 2014, in the Court of Common Pleas of Northumberland County, which involuntarily terminated her parental rights to her minor daughter, A.E.C. ("Child").[1]  We affirm.

The record reveals the relevant factual and procedural history, as follows.  Northumberland County Children and Youth Services ("CYS") received a referral regarding the birth of Child in December of 2012.  N.T., 10/8/2014 (Part 1), at 17.  At the time Child was born, Mother tested

---

[1] By separate decree entered that same day, the orphans' court involuntarily terminated the parental rights of Child's father, J.C., Jr. ("Father"), from which he filed a notice of appeal.  The disposition of Father's appeal is by separate memorandum.

positive for opiates and morphine, while Child tested positive for opiates and amphetamines. *Id.* Mother later admitted that she used heroin during her pregnancy, and that she received little, if any, prenatal care. *Id.* at 19. Child initially was scheduled to be released from the hospital in early January of 2013. *Id.* at 20. However, Child's discharge was delayed because she was diagnosed with congenital nephrotic syndrome, a severe kidney condition. *Id.* Child began receiving infusions of albumin, and had a kidney removed when she was approximately two months old. *Id.* at 21. Child began dialysis treatments when she was several months old. *Id.*

When Child was about four months old, she was discharged from the hospital and returned to the care of Mother and Father, who began residing in the home of Child's paternal grandfather and his wife. *Id.* However, Child was not gaining the desired amount of weight, and Mother claimed repeatedly that she was unable to provide a urine sample so that CYS could perform drug screens. *Id.* at 22-23. Mother and Father also failed to bring Child to two of her appointments, and were late in bringing Child to a third. *Id.* at 23-24, 26-27. Ultimately, Mother signed a voluntary entrustment agreement placing Child in the care of CYS on May 3, 2013. *Id.* at 22. Child was adjudicated dependent on June 6, 2013.[2]

---

[2] The date of Child's adjudication of dependency is not clear from the certified record on appeal. June 6, 2013, is the date provided by the orphans' court in its opinion pursuant to Pa.R.A.P. 1925(a).

On May 29, 2014, CYS filed a petition to involuntarily terminate Mother's parental rights to Child.[3]   A termination hearing was held on October 8, 2014, during which the orphans' court heard the testimony of CYS caseworkers Jennifer Riley, Courtney Underkoffler, and Leslee Maturani. The court heard further testimony from Child's foster father, C.Y. ("Foster Father"), and Mother.[4]   The court entered its decree terminating Mother's parental rights on October 16, 2014.  On November 14, 2014, Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother now presents the following issues for our review:

I. Whether the [orphans'] court erred in determining that [CYS] presented clear and convincing evidence that grounds for involuntary termination exist?

II. Whether the [orphans'] court erred in determining that the best interests of the Child would be served by terminating parental rights?

Mother's brief at 7 (orphans' court answers and unnecessary capitalization omitted).

_____

[3] In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court states that CYS filed its termination petition on June 3, 2014.  However, the petition is stamped as having been filed on May 29, 2014.  On June 3, 2014, the court entered an order scheduling the termination hearing, and issued notice of the hearing.
[4] The termination hearing was split into two parts.  CYS presented its evidence with respect to Mother during the first part of the hearing, and then presented its evidence with respect to Father during the second part.

J-S26002-15

We review this appeal according to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel Bassett v. Kia Motors America, Inc.*, [613] Pa. [371], [455,] 34 A.3d 1, 51 (2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis:

- 4 -

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). This Court need only agree with any one subsection of 23 Pa.C.S.A. § 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we conclude that the orphans' court properly terminated Mother's parental rights pursuant to Sections 2511(a)(1) and (b), which provide as follows:

 **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> . . .

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1) and (b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties."  ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***In re Adoption of R.J.S.***, 901 A.2d 502, 510 (Pa. Super. 2006)). Further,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment

- 6 -

contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id.* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

In *In re Adoption of S.P.*, *supra*, our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The *S.P.* Court stated:

> Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*In re Adoption of S.P.*, 47 A.3d at 828. The *S.P.* Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[*McCray*] at 655 (footnotes and internal quotation marks omitted). . . .

*In re Adoption of S.P.*, *supra*; *see also In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (internal citations omitted) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Mother argues that her parental rights should not have been terminated because she has remedied her drug addiction, and because she will be able to obtain housing and employment within two to three months. Mother's brief at 12-14. Mother also contends that she is willing to receive the medical training necessary to care for Child. *Id.* at 14.

In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court found

as follows:

> The Petition for Termination of Parental Rights was filed on June 3, 2014. The six months immediately preceding this date correspond with a time period during which [] Mother was almost entirely out of contact with [CYS] and . . . Child. A caseworker was able to contact her on February 10, 2014 at the time and place scheduled for a custody hearing for [] Mother's other child. At that time, [] Mother did submit to drug testing, and the results were positive, however she failed to seek inpatient treatment as ordered by the [c]ourt in the various permanency review orders. In fact, she did not seek such treatment until after her arrest in May of [2014], less than a month prior to the filing of the termination petition, and [CYS] was unaware of this until they made contact with her probation officer. She was discharged from rehabilitation on September 23 of [2014]. [] Mother provided no housing, financial support, or medical care for . . . Child during this time period. It is unknown whether she had employment or independent housing during this time period. She attended two supervised visits on November 12 and December 3 of 2013. She may have visited . . . Child during an extended hospitalization period between December 17, 2013 and January 17, 2014. [] Mother sent no correspondence to . . . Child during this time period.

> Also during this time period . . . [C]hild was hospitalized several times and required daily medical care while out of the hospital. [] Mother did not even attempt to attend medical training to learn how to address . . . Child's medical concerns (despite having been court-ordered to do so), let alone actually provide any medical support or care for . . . Child. This inaction on the part of . . . Mother points to both a settled purpose of relinquishment and a failure to perform parental duties during the relevant six month period.

> Further, an Aggravated Circumstances Order was entered on July 18, 2014, citing the failure of both [] Father and [] Mother to maintain substantial and continuing contact with . . . Child for a period of six months. During much of this time period, . . . Mother's whereabouts were unknown, as she failed to maintain contact with [CYS].

Orphans' Court Opinion, 12/6/2014, at 5-6 (citations to the record omitted). The testimonial evidence supports the court's findings, as follows.

CYS caseworker, Jennifer Riley, testified concerning the circumstances leading up to Child's placement in foster care, discussed *supra*. N.T., 10/8/2014 (Part 1), at 17-30. After being removed from the care of Mother and Father on May 3, 2013, Child was hospitalized for approximately 10 days. *Id.* at 30-31, 33. Mother did not visit with Child during this time, despite being offered transportation. *Id.* at 31. After Child was discharged from the hospital, Mother participated in weekly visitation for a period of two hours in the maternal grandmother's home. *Id.* Mother attended these visits on a "fairly regular" basis. *Id.* at 32. Mother also attended group outpatient counseling. *Id.* at 33.

Ms. Courtney Underkoffler testified that she was the caseworker assigned to this matter from July of 2013 until October of 2013. *Id.* at 37. During this time, Mother continued to claim that she was unable to produce a urine sample so that she could be drug tested. *Id.* at 38. Mother also was offered biweekly supervised visitation at CYS, but missed "some" of the visits. *Id.* at 38-39. Ms. Underkoffler noted that Mother was not visiting with Child at the hospital as consistently as CYS would have liked. *Id.* at 39.

Ms. Leslee Maturani testified that she took over as Child's caseworker in late October or early November of 2013, and that she has been assigned to this matter ever since. *Id.* at 42. During Ms. Maturani's assignment to

- 10 -

this case, Mother continued to refuse to provide urine samples. *Id.* at 43-44. Finally, Mother produced a urine sample on February 10, 2014, which tested positive for "oxyies and opiates." *Id.* at 44. Ms. Maturani requested that Mother attend inpatient rehabilitation, and Mother stated that she would consider it. *Id.* at 44. Mother was arrested in May of 2014, and incarcerated. *Id.* at 44-45. Mother then attended two rehabilitation programs. *Id.* at 45. On July 17, 2014, an order was entered finding aggravated circumstances as to Mother, due to her failure to maintain substantial and continuing contact with Child for a period of six months. *Id.* at 52-53. Mother was released from rehabilitation on September 23, 2014. *Id.*

Ms. Maturani further testified that she has supervised two visits between Mother and Child, which took place on November 12, 2013, and December 3, 2013. *Id.* at 46. Tragically, Child suffered a stroke and was hospitalized on December 4, 2013. *Id.* Mother visited Child at the hospital on December 5, 2013, December 6, 2013, and December 8, 2013, which was Mother's last documented visit. *Id.* at 48-50. Child was discharged from the hospital on approximately December 10, 2013, but was readmitted on December 17, 2013. *Id.* at 46, 49. Child remained at the hospital until January 17, 2014. *Id.* Ms. Maturani did not have a record of whether or not Mother visited with Child during this time. *Id.* Ms. Maturani noted that

Mother has not requested a visit since that time, and that Mother never completed the medical training necessary to care for Child.[5] *Id.* at 45, 51.

Mother testified that she did not disagree with any of the prior witnesses' testimony. *Id.* at 71. When asked what she had been doing for the last six months, Mother responded, "Drugs, rehab, incarceration. I was out for two days, overdosed, back into jail, incarcerated, and rehab." *Id.* at 71. Mother stated that she did not learn anything during her first two stays in rehabilitation programs, but that her most recent stay was very helpful. *Id.* at 71-72. Mother claimed that she has been clean for 145 days, and that she currently is attending intensive outpatient treatment three days per week, *inter alia*. *Id.* at 72. Mother indicated that she has not visited with Child because of her addiction. *Id.* at 76. Mother admitted that she has the phone number for CYS, and that she lives only a five-minute walk away from CYS. *Id.* at 75-76. Still, Mother acknowledged that she did not contact CYS in order to have contact with Child. *Id.* at 76.

Mother further testified that she is "not looking to get [Child] back right now like today. All I'm looking for is a chance." *Id.* at 73. Mother admitted that she could not safely provide for Child without the proper medical training, and that "it's going to take time" before she is able to care

_____

[5] Foster Father stated that he has never spoken with Mother, and that Mother has not sent anything to Child since she has been in his care. N.T., 10/8/2014 (Part 1), at 62, 65-66.

for Child. *Id.* at 77. Mother predicted that she would be able to care for Child as soon as she acquires "a job and a house." *Id.* at 73. Mother hoped that this would take "no more than three months." *Id.* at 78.

Thus, the testimonial evidence demonstrates that Mother refused or failed to perform parental duties for a period of at least six months prior to the filing of the petition to terminate her parental rights on May 29, 2014. Mother's last documented visit with Child took place on December 8, 2013, during the beginning of the relevant six-month period. Since that time, it appears that Mother has made no effort to maintain contact with Child or a place of importance in Child's life. Moreover, Mother has never completed the necessary medical training that she would need to care for Child. Mother's actions demonstrate a "merely passive interest" in Child, at best. *B.,N.M.*, 856 A.2d at 855. As such, Mother's conduct warrants termination pursuant to Section 2511(a)(1).

Having determined that the orphans' court properly terminated Mother's parental rights pursuant to Section 2511(a)(1), we now review the order pursuant to Section 2511(b). The orphans' court found as follows:

> Here, the [c]ourt examined the existence and quality of the bond between [] Mother and . . . Child. As the [c]ourt stated in its order of October 15, 2014:
>
>> The [c]ourt has examined whether there is an emotional bond between the parent and the child and if severing that bond would negatively affect the child's developmental, physical and emotional needs. The [c]ourt finds that the mother has had no visits with her child since December of 2013. The child

- 13 -

was placed in an approved foster care home on May 3, 2013, . . . . From that time until December 8, 2013, the mother visited her child ten (10) times. There have been no visits by the mother with her child in ten (10) months. Based on the forgoing, there is no evidence presented of any emotional bond between the parent and the child. The [c]ourt therefore finds that there is no emotional bond between the parent and child.

There was no evidence of any bond presented, and in the absence of such evidence, the [c]ourt reasonably inferred that no such bond exists between [] Mother and [] Child. Further, . . . Child has established a firm bond with her foster family, a family with whom she has lived since January of 2014 and that is willing to provide permanency for . . . Child. The pairing of . . . Child with this foster family is particularly fortuitous when one recalls that these foster parents have attended medical trainings specific to the medical issues experienced on a daily basis by . . . Child (to say nothing of their independent medical training as EMTs) and have been steadfast in their attentiveness and responsiveness to all of her medical needs since her arrival in their home. The best interests of . . . Child would be served by termination of [] Mother's parental rights.

Orphans' Court Opinion, at 9-10 (citation to the record omitted). Again, the testimonial evidence supports the court's findings.

Ms. Maturani testified that Child has resided with her current foster family since January 17, 2014. N.T., 10/8/2014 (Part I), at 58. Child's foster parents are "very active" in Child's treatment. *Id.* Ms. Maturani stated that Child views her foster parents as her parents, due to her lack of contact with Mother and Father, and looks to them for comfort. *Id.* at 59.

Foster Father testified that he is a certified paramedic. *Id.* at 62. Foster Father stated that Child is generally unable to make it through the night without medical attention, and requires care 24 hours per day. *Id.* at

68-69. Foster Father explained that Child does not have kidneys and receives nightly dialysis. *Id.* at 63. Child also has a feeding tube and receives injections of Procrit. *Id.* Child suffers from chronic vomiting, sleep apnea, and anemia issues, and has experienced an episode of congestive heart failure. *Id.* at 63-64. Foster Father noted that Child is only comfortable around him and her foster mother, and that Child "does not deal well with going with other people," including nurses. *Id.* at 67.

Based upon this evidence, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(b). It was reasonable for the court to infer that there is no bond between Mother and Child, given Child's age and Mother's lack of recent visits. *In re Adoption of J.M.*, 991 A.2d at 324. In addition, Child's extensive medical needs are being met in her current foster placement. Where, as here, the petitioner is an agency it is not necessary that an adoption is presently contemplated nor that a person with a present intention to adopt exists. 23 Pa.C.S. § 2512(b).

Accordingly, we affirm the decree involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/30/2015